**In the Matter of the MARRIAGE OF J.B. AND H.B.**

**In re State of Texas, Relator.**

**No. 05–09–01170–CV.**

Court of Appeals of Texas, Dallas.

Aug. 31, 2010.

Supplemental Opinion on Denial of En Banc Reconsideration Dec. 8, 2010.

James C. Ho, Solicitor General, Reed N. Smith, James D. Blacklock, Office of Attorney General, Austin, TX, for Appellant.

Peter A. Schulte, Schulte & Apgar, PLLC, J. Carl Cecere, Akin, Gump, Strauss, Hauer & Feld, L.L.P., Dallas, TX, James Scheske, Akin, Gump, Strauss, Hauer & Feld, L.L.P., Austin, TX, for Appellee.

Jeffrey C. Mateer, Hiram S. Sasser, III, Erin E. Leu, Plano, for Other.

Before Justices BRIDGES, FITZGERALD, and FILLMORE.

## OPINION

Opinion By Justice FITZGERALD.

Does a Texas district court have subject-matter jurisdiction over a divorce case arising from a same-sex marriage that oc-

curred in Massachusetts? The trial court held that it had jurisdiction and that article I, section 32(a) of the Texas Constitution and section 6.204 of the Texas Family Code, which limit marriage to opposite-sex couples, violate the Equal Protection Clause of the Fourteenth Amendment. We hold that Texas district courts do not have subject-matter jurisdiction to hear a same-sex divorce case. Texas's laws compelling this result do not violate the Equal Protection Clause of the Fourteenth Amendment.

Accordingly, we reverse the trial court's order and remand with instructions to dismiss the case for lack of subject-matter jurisdiction. We also conditionally grant the State's petition for writ of mandamus to correct the trial court's erroneous striking of the State's petition in intervention.

## I. BACKGROUND

Appellee filed a petition for divorce in Dallas County in which he sought a divorce from H.B., whom appellee alleged to be his husband. Appellee alleged that he and H.B. were lawfully married in Massachusetts in September 2006 and moved to Texas in 2008. Appellee further alleged that he and H.B. "ceased to live together as husband and husband" in November 2008.

Appellee alleged in his divorce petition that there are no children of the marriage, born or adopted, and he requested a division of community property if a property-division agreement could not be reached. He prayed for a divorce, that his last name be changed back to his original last name,

and "for general relief." The record contains no answer by H.B.

A few days after appellee filed suit, the State intervened in the action "as a party respondent to oppose the Petition for Divorce and defend the constitutionality of Texas and federal law." The Texas laws in question are article I, section 32(a) of the Texas Constitution and section 6.204 of the Texas Family Code. The federal law in question is the Defense of Marriage Act (DOMA), 28 U.S.C. § 1738C.[1] The State alleged that appellee is not a party to a "marriage" under Texas law, that he is therefore not eligible for the remedy of divorce, and that the trial court cannot grant a divorce without violating Texas law. At the end of its petition in intervention, the State prayed for dismissal of the petition for divorce.

Several weeks later, the State filed a plea to the jurisdiction in which it asserted, inter alia, that the trial court lacked subject-matter jurisdiction because appellee's petition demonstrated on its face that he and H.B. were not "married" as a matter of Texas law. The State asserted that section 6.204(c) of the family code "strips courts of jurisdiction" to confer the legal status of marriage upon any relationship besides the union of one man and one woman—even if only for the purpose of granting a divorce.

The trial court denied the State's plea to the jurisdiction without a hearing. In its order, the court concluded that article I, section 32(a) of the Texas Constitution and section 6.204 of the family code violate the Equal Protection Clause of the Fourteenth Amendment. It further concluded that it

---

1. "No State, territory, or possession of the United States, or Indian tribe, shall be required to give any effect to any public act, record, or judicial proceeding of any other State, territory, possession, or tribe respecting a relationship between persons of the same

sex that is treated as a marriage under the laws of such other State, territory, possession, or tribe, or a right or claim arising from such relationship." 28 U.S.C.A. § 1738C (West 2006).

had jurisdiction "to hear a suit for divorce filed by persons legally married in another jurisdiction and who meet the residency and other prerequisites required to file for divorce in Dallas County, Texas." It ordered "that Intervenor's Plea to the Jurisdiction is denied and that the Intervention filed by the Office of the Attorney General is hereby stricken." The State filed its notice of interlocutory appeal the day after the trial court signed the order. A few days later, the State filed its Conditional Petition for Writ of Mandamus in this Court seeking relief from the part of the trial court's order striking its petition in intervention.

Within twenty days after the court signed the order, appellee filed a request for findings of fact and conclusions of law. The State opposed the request. A few weeks later, the trial court signed both a set of findings of fact and conclusions of law and an amended order denying the State's plea to the jurisdiction. In the amended order, the court made no reference to article I, section 32 of the Texas Constitution, concluded that section 6.204 of the family code violated several provisions of the federal Constitution in addition to the Equal Protection Clause, and concluded that the State lacked both constitutional and statutory authority to intervene. The amended order concluded, "Therefore, the State's Plea to the Jurisdiction is denied and the Intervention filed by the Office of the Attorney General is hereby stricken."

We have consolidated the State's mandamus proceeding with its interlocutory appeal.

## II. MANDAMUS RELIEF FROM ORDER STRIKING INTERVENTION

■ To obtain mandamus relief from the order striking its intervention, the State must meet two requirements. It must show that the trial court clearly abused its discretion and that the State has no adequate remedy by appeal. *In re Prudential Ins. Co. of Am.*, 148 S.W.3d 124, 135–36 (Tex.2004) (orig.proceeding); *see also Walker v. Packer*, 827 S.W.2d 833, 839–40 (Tex.1992) (orig.proceeding). In its mandamus petition, the State contends that the trial court clearly abused its discretion by striking the State's intervention sua sponte and without sufficient cause. The State further contends that its remedy by appeal is inadequate.

We agree with the State that the trial court clearly abused its discretion by striking the State's intervention sua sponte. Texas Rule of Civil Procedure 60 provides, "Any party may intervene by filing a pleading, subject to being stricken out by the court for sufficient cause *on the motion of any party.*" Tex.R. Civ. P. 60 (emphasis added). The court abuses its discretion by striking an intervention in the absence of a motion to strike. *Guar. Fed. Sav. Bank v. Horseshoe Operating Co.*, 793 S.W.2d 652, 657 (Tex.1990); *Prototype Mach. Co. v. Boulware*, 292 S.W.3d 169, 172 (Tex.App.-San Antonio 2009, no pet.); *Ghidoni v. Stone Oak, Inc.*, 966 S.W.2d 573, 586 (Tex.App.-San Antonio 1998, pet. denied) (en banc); *Flores v. Melo–Palacios*, 921 S.W.2d 399, 404 (Tex. App.-Corpus Christi 1996, writ denied). Because appellee did not file a motion to strike the State's intervention, the trial court clearly abused its discretion.

■ The foregoing analysis also disposes of appellee's argument that the trial court did not abuse its discretion by striking the State's intervention because the office of the attorney general has no justiciable interest in the case. Lack of a justiciable interest to intervene must be raised by a motion to strike or the defense is waived. *Bryant v. United Shortline Inc. Assur. Servs., N.A.*, 972 S.W.2d 26, 31

(Tex.1998); *see also Guar. Fed. Sav. Bank,* 793 S.W.2d at 657. Thus, appellee cannot defend the trial court's action by arguing that the State (which is the actual intervenor, not the office of the attorney general) lacks a justiciable interest in the case.

■■■ We also agree with the State that it has no adequate remedy by appeal. This second prong of the test for mandamus relief has no comprehensive definition but calls for "the careful balance of jurisprudential considerations." *In re Prudential Ins. Co.,* 148 S.W.3d at 136. "When the benefits outweigh the detriments, appellate courts must consider whether the appellate remedy is adequate." *Id.* The detriments of mandamus review can include undue interference with trial-court proceedings, diversion of appellate-court attention to issues that are not important to the litigation or the development of the law, and increase in expense to the parties. *Id.* But mandamus review may yield benefits as well:

> Mandamus review of significant rulings in exceptional cases may be essential to preserve important substantive and procedural rights from impairment or loss, allow the appellate courts to give needed and helpful direction to the law that would otherwise prove elusive in appeals from final judgments, and spare private parties and the public the time and money utterly wasted enduring eventual reversal of improperly conducted proceedings.

*Id.* The balancing of detriments and benefits is practical and prudential. *Id.*

■■ In this case, the benefits of mandamus review outweigh the detriments. This is an exceptional case that involves not only basic principles of subject-matter jurisdiction but also the constitutionality of Texas's laws concerning marriage. The trial court's order striking the State's petition in intervention potentially interferes with the State's important right to be heard on the constitutionality of its statutes and its statutory right to pursue an interlocutory appeal of the denial of its plea to the jurisdiction. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 37.006(b) (Vernon 2008) (requiring attorney general to be given notice of any proceeding in which a statute is alleged to be unconstitutional); *id.* § 51.014(a)(8) (authorizing interlocutory appeal from denial of plea to the jurisdiction by a governmental unit); *see also Wilson v. Andrews,* 10 S.W.3d 663, 666 (Tex.1999) (attorney general intervened to defend statute, moved for summary judgment, and pursued appeal to Texas Supreme Court); *Kern v. Taney,* 11 Pa. D. & C.5th 558, 559 (Ct.Com.Pl.2010) (Pennsylvania attorney general intervened and participated in hearing regarding court's subject-matter jurisdiction to hear same-sex divorce case). When the right to participate in litigation is wrongfully denied, mandamus relief is likely to be appropriate. *See In re Lumbermens Mut. Cas. Co.,* 184 S.W.3d 718 (Tex.2006) (orig.proceeding) (granting mandamus and ordering court of appeals to allow insurer to participate in appeal so that insurer, which had superseded judgment, could defend its own interests). Mandamus relief will also yield the benefit of sparing the parties and the public the time and expense of divorce proceedings in a court that might lack subject-matter jurisdiction to proceed. *Cf. In re Sw. Bell Tel. Co., L.P.,* 235 S.W.3d 619, 627 (Tex.2007) (orig.proceeding) (granting mandamus relief from denial of Southwestern Bell's plea to the jurisdiction); *Nat'l Indus. Sand Ass'n v. Gibson,* 897 S.W.2d 769, 776 (Tex. 1995) (orig.proceeding) (granting mandamus relief to correct erroneous assertion of personal jurisdiction over nonresident defendant). Because this is an issue that is likely to arise in other cases, prompt

appellate resolution of the subject-matter-jurisdiction question will have broad public benefits.

As compared to these benefits, the detriments of mandamus review in this case are not substantial. Mandamus review of the order in question does not require this Court to dedicate its resources to a routine or unimportant matter. Rather, in the absence of mandamus review, our consideration of issues that are important both to this litigation and to the law of this state would be impeded. Moreover, any additional expense that mandamus review imposes on the parties is offset by the savings of time and expense that will be gained by prompt appellate consideration of the State's jurisdictional challenge.

We hold that the trial court clearly abused its discretion by striking the State's intervention and that the State lacks an adequate remedy by appeal. Accordingly, we conditionally grant mandamus relief with respect to the order striking the State's intervention.

### III. INTERLOCUTORY APPEAL

A plea to the jurisdiction contests a trial court's subject-matter jurisdiction. *Dallas Fort Worth Int'l Airport Bd. v. Cox*, 261 S.W.3d 378, 386 (Tex.App.-Dallas 2008, no pet.). We review an order on a plea to the jurisdiction de novo. *Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 228 (Tex.2004). When a plea to the jurisdiction challenges the pleadings, as in this case, we determine if the pleader has alleged facts that affirmatively demonstrate the court's jurisdiction to hear the case. *Id.* at 226. If the pleadings do not affirmatively demonstrate the trial court's jurisdiction but also do not affirmatively demonstrate incurable defects in jurisdiction, the plaintiff should be afforded the opportunity to amend. *Id.* at 226–27. But if the pleadings affirmatively negate the

existence of jurisdiction, then a plea to the jurisdiction may be granted without allowing the plaintiff an opportunity to amend. *Id.* at 227; *see also* Rebecca Simmons & Suzette K. Patton, *Plea to the Jurisdiction: Defining the Undefined*, 40 ST. MARY'S L.J. 627, 648–54 (2009) (discussing *Miranda*).

Determinations of questions of law are reviewed de novo. *Hoff v. Nueces Cnty.*, 153 S.W.3d 45, 48 (Tex.2004) (per curiam). This includes "questions raising constitutional concerns." *State v. Hodges*, 92 S.W.3d 489, 494 (Tex.2002).

▮▮▮ The State asserts that we should disregard the trial court's amended order denying the State's plea to the jurisdiction because it was signed during the automatic stay under section 51.014(b) of the civil practice and remedies code. We agree. When the State commenced this interlocutory appeal by filing its notice of appeal, "all other proceedings in the trial court" were stayed pending resolution of the appeal. TEX. CIV. PRAC. & REM.CODE ANN. § 51.014(b). An order signed during a stay is a "legal nullity." *Amrhein v. La Madeleine, Inc.*, 206 S.W.3d 173, 174–75 (Tex.App.-Dallas 2006, no pet.). Accordingly, the trial court erred by signing the amended order. We vacate the amended order and analyze the State's appeal in light of the grounds stated in the trial court's original order. We also disregard the trial court's findings of fact and conclusions of law signed after the stay went into effect.

### IV. TEXAS COURTS LACK SUBJECT-MATTER JURISDICTION OVER SAME-SEX DIVORCE CASES

#### A. The Texas Constitution and Texas Family Code

The Texas Constitution was amended in 2005 to provide as follows:

(a) Marriage in this state shall consist only of the union of one man and one woman.

(b) This state or a political subdivision of this state may not create or recognize any legal status identical or similar to marriage.

TEX. CONST. art. I, § 32.

Under the Texas Family Code, the term "suit for dissolution of marriage" encompasses three distinct kinds of suits: suits for divorce, suits for annulment, and suits to declare a marriage void. TEX. FAM.CODE ANN § 1.003 (Vernon 2006); *see also id.* §§ 6.001–.206 (Vernon 2006 & Supp.2009). In 2003, the legislature declared that same-sex marriages are void by adopting section 6.204, which provides in pertinent part as follows:

(b) A marriage between persons of the same sex or a civil union is contrary to the public policy of this state and is void in this state.

(c) The state or an agency or political subdivision of the state may not give effect to a:

(1) public act, record, or judicial proceeding that creates, recognizes, or validates a marriage between persons of the same sex or a civil union in this state or in any other jurisdiction; or

(2) right or claim to any legal protection, benefit, or responsibility asserted as a result of a marriage between persons of the same sex or a civil union in this state or in any other jurisdiction.

*Id.* § 6.204(b)–(c) (Vernon 2006). Even before the adoption of section 6.204, the family code provided, "A [marriage] license may not be issued for the marriage of persons of the same sex." *Id.* § 2.001(b). The statute governing informal marriage also characterizes the relationship as a "marriage of a man and woman." *Id.* § 2.401(a).

Appellee did not plead for a declaration of voidness. Rather, he sought a divorce on the ground of insupportability. His petition tracks the language of section 6.001, which provides:

On the petition of either party to a marriage, the court may grant a divorce without regard to fault if the marriage has become insupportable because of discord or conflict of personalities that destroys the legitimate ends of the marital relationship and prevents any reasonable expectation of reconciliation.

*Id.* § 6.001. A divorce based on this provision is commonly known as a "no-fault divorce." *See, e.g., Waite v. Waite,* 64 S.W.3d 217, 220 (Tex.App.-Houston [14th Dist.] 2001, pet. denied) (plurality op.); *Clay v. Clay,* 550 S.W.2d 730, 733–34 (Tex. Civ.App.-Houston [1st Dist.] 1977, no writ).

## B. The Law of Subject–Matter Jurisdiction

"Jurisdiction refers to the power of a court, under the constitution and laws, to determine the merits of an action between the parties and render judgment." *Ysasaga v. Nationwide Mut. Ins. Co.,* 279 S.W.3d 858, 864 (Tex.App.-Dallas 2009, pet. denied); *see also Univ. of Tex. Sw. Med. Ctr. v. Loutzenhiser,* 140 S.W.3d 351, 359 (Tex.2004) ("The failure of a jurisdictional requirement deprives the court of the power to act (other than to determine that it has no jurisdiction), and ever to have acted, as a matter of law."). "Personal jurisdiction" refers to a court's power to render a binding judgment against a particular person or entity, typically a nonresident. *See, e.g., CSR Ltd. v. Link,* 925 S.W.2d 591, 594 (Tex.1996). "Subject-matter jurisdiction," by contrast, refers to the court's power to hear a particular type of suit. *Id.* "Subject matter jurisdiction is essential for a court to have authority to

decide a case; it is never presumed and cannot be waived." *Combs v. Kaufman Cnty.*, 274 S.W.3d 922, 925 (Tex.App.-Dallas 2008, pet. denied).

▪ The trial court in this case is a district court, so the starting presumption is that it possesses subject-matter jurisdiction over the case. This is because "Texas district courts are courts of general jurisdiction with the power to hear and determine any cause that is cognizable by courts of law or equity and to grant any relief that could be granted by either courts of law or equity." *Thomas v. Long*, 207 S.W.3d 334, 340 (Tex.2006) (internal quotations and citations omitted). "Courts of general jurisdiction presumably have subject matter jurisdiction unless a contrary showing is made." *Subaru of Am., Inc. v. David McDavid Nissan, Inc.*, 84 S.W.3d 212, 220 (Tex.2002); *accord Liebbe v. Rios*, No. 05-07-00381-CV, 2008 WL 1735448, at *3 (Tex.App.-Dallas Apr. 16, 2008, no pet.) (mem.op.); *see also* Tex. Const. art. V, § 8 ("District Court jurisdiction consists of exclusive, appellate, and original jurisdiction of all actions, proceedings, and remedies, except in cases where exclusive, appellate, or original jurisdiction may be conferred by this Constitution or other law on some other court, tribunal, or administrative body.").

▪ A Texas trial court may lack subject-matter jurisdiction over a particular case or claim for a variety of reasons, such as immunity from suit, *Harris Cnty. v. Sykes*, 136 S.W.3d 635, 638 (Tex.2004), exclusive federal jurisdiction, *see, e.g.*, 28 U.S.C.A. § 1338(a) (West 2006) (giving federal district courts jurisdiction "exclusive of the courts of the states in patent, plant variety protection and copyright cases"), and the effect of an automatic bankruptcy stay, *Brashear v. Victoria Gardens of McKinney, L.L.C.*, 302 S.W.3d 542, 550-52 (Tex.App.-Dallas 2009, no

pet.). Difficulties occasionally arise when the legislature adopts a rule that imposes a mandatory requirement on a claimant but does not specify whether failure to satisfy that requirement defeats the court's jurisdiction or merely means the claim fails on the merits. In such cases, we presume that the legislature did not intend to make the requirement jurisdictional unless application of statutory-interpretation principles reveals a clear legislative intent to the contrary. *City of DeSoto v. White*, 288 S.W.3d 389, 394 (Tex.2009).

## C. The Parties' Contentions

The State argues that section 6.204(c) of the family code and section 32(b) of article I of the Texas Constitution strip Texas trial courts of jurisdiction in same-sex-divorce cases because adjudicating the merits of such a case would recognize or "give effect to a ... right or claim" based on a same-sex marriage. Under the Texas Constitution, the state cannot "create or recognize" marriages other than between one man and one woman. Tex. Const. art. I, § 32(b). Under section 6.204(c) of the Texas Family Code, the state cannot "give effect to a ... right or claim to any legal protection, benefit, or responsibility asserted as a result of a marriage between persons of the same sex." Tex. Fam.Code Ann. § 6.204(c)(2). Appellee's principal response is that the trial court does not adjudicate or establish the validity of a marriage in a divorce case, and thus a divorce case does not recognize or give effect to a same-sex marriage formed in another jurisdiction. Appellee also urges us to apply the "place-of-celebration test" and conclude that he and H.B. are validly married for the limited purpose of adjudicating his divorce petition.

## D. Application of Texas Law

In construing a statute, our objective is to ascertain and effectuate the legislature's

intent. Our starting point is the plain and ordinary meaning of the words of the statute. If a statute's meaning is unambiguous, we generally enforce it according to its plain meaning. We read the statute as a whole and interpret it so as to give effect to every part. *City of San Antonio v. City of Boerne,* 111 S.W.3d 22, 25 (Tex.2003).

Section 6.204(b) declares same-sex marriages void and against Texas public policy. TEX. FAM.CODE ANN. § 6.204(b). "Void" means having no legal effect. *In re Calderon,* 96 S.W.3d 711, 719–20 (Tex. App.-Tyler 2003, orig. proceeding [mand. denied]); *see also Harris Cnty. Hosp. Dist. v. Tomball Reg'l Hosp.,* 283 S.W.3d 838, 850 (Tex.2009) ("A law that is declared void has no legal effect."). Thus, section 6.204(b) means that same-sex marriages have no legal effect in Texas. *See also* TEX. CONST. art. I, § 32.

Next, section 6.204(c)(1) provides that Texas and its agencies and subdivisions may not give any effect to any public act, record, or judicial proceeding that creates, recognizes, or validates a same-sex marriage "in this state or in any other jurisdiction." Thus, section 6.204(c)(1) amplifies section 6.204(b) by providing explicitly that the rule of voidness applies even to same-sex marriages that have been recognized by another jurisdiction. Further, section 6.204(c)(1) mandates that Texas courts may not give any legal effect whatsoever to a public act, record, or judicial proceeding that validates a same-sex marriage. *See also* TEX. CONST. art. I, § 32. In the case before us, appellee attached his Massachusetts marriage certificate to his divorce petition. Section 6.204(c)(1), which addresses "any public act, record, or judicial proceeding" that "creates, recognizes, or validates a same-sex marriage" in another jurisdiction, in this case, Massachusetts, provides the trial court may not give any legal effect to this document. Thus,

section 6.204(c)(1) precludes any use of the marriage certificate in this case.

Section 6.204(c)(2) forbids the state and its subdivisions from giving any effect to a "right or claim to any legal protection, benefit, or responsibility asserted as a result of a" same-sex marriage. Thus, the State may not give any legal effect even to a claim to a protection or benefit predicated on a same-sex marriage. A petition for divorce is a claim—that is, "a demand of a right or supposed right," WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY UNABRIDGED 414 (1981)—to legal protections, benefits, or responsibilities "asserted as a result of a marriage," TEX. FAM.CODE ANN. § 6.204(c)(2), one example of such a benefit being community-property rights. Under section 6.204(c)(2), the State cannot give any effect to such a petition when it is predicated on a same-sex marriage. If a trial court were to exercise subject-matter jurisdiction over a same-sex divorce petition, even if only to deny the petition, it would give that petition some legal effect in violation of section 6.204(c)(2). In order to comply with this statutory provision and accord appellee's same-sex divorce petition no legal effect at all, the trial court must not address the merits. In other words, the court must dismiss for lack of subject-matter jurisdiction. *See Ysasaga,* 279 S.W.3d at 864 ("Jurisdiction refers to the power of a court, under the constitution and laws, to determine the merits of an action between the parties and render judgment.").

Thus, in the instant case, section 6.204(c) precludes a trial court from giving any legal effect to appellee's petition for divorce and all supporting documentation, and it deprives the trial court of subject-matter jurisdiction.

Our holding that section 6.204(c) is a jurisdictional bar is consistent with *Mireles v. Mireles,* wherein Jennifer Jack

married and divorced Andrew Mireles. No. 01–08–00499–CV, 2009 WL 884815, at *1 (Tex.App.-Houston [1st Dist.] Apr. 2, 2009, pet. denied) (mem. op.). She then filed a "petition for bill of review" seeking to vacate the divorce decree on the ground that Mireles was actually born female, making their marriage a void same-sex marriage. *Id.* The trial court granted Jack's petition and set aside the divorce decree. *Id.* The court of appeals affirmed. It concluded that Jack's action was actually a collateral attack rather than a bill of review, but held that the collateral attack was proper because a void judgment "may be attacked collaterally with extrinsic evidence when the court 'has not, under the very law of its creation, any possible power' to decide the case." *Id.* at *2 (quoting *Templeton v. Ferguson*, 89 Tex. 47, 54, 33 S.W. 329, 332 (Tex.1895)). "A Texas court has no more power to issue a divorce decree for a same-sex marriage than it does to administer the estate of a living person." *Id.* By holding that the original trial court had no "power" to issue the divorce decree, the court of appeals held, in effect, that the trial court lacked the subject-matter jurisdiction to grant a divorce. *See Tellez v. City of Socorro*, 226 S.W.3d 413, 413 (Tex.2007) (per curiam) ("Subject-matter jurisdiction 'involves a court's power to hear a case.' ") (quoting *United States v. Cotton*, 535 U.S. 625, 630, 122 S.Ct. 1781, 152 L.Ed.2d 860 (2002)). Appellee argues that *Mireles* is factually distinguishable because the parties in that case were married in Texas, but we see nothing in the opinion indicating where the marriage ceremony took place. Moreover, such a factual distinction would be immaterial because the Texas Constitution and section 6.204 apply equally whether a same-sex marriage is contracted in Texas or in some other jurisdiction. Tex. Const. art. I, § 32; Tex. Fam.Code Ann. § 6.204(c).

Appellee contends that adjudicating a same-sex divorce does not "give effect" to a same-sex marriage because a divorce decree does not establish the validity of the marriage as against third parties. The Texas Constitution and section 6.204 of the Texas Family Code, however, forbid the State and its agencies from giving *any effect whatsoever* to a same-sex marriage. Thus, in order to prevail, appellee must show that a same-sex divorce gives no effect at all to the purported same-sex marriage. He cannot do so. A same-sex divorce proceeding would give effect to the purported same-sex marriage in several ways. For one, it would establish the validity of that marriage as to the parties involved under principles of res judicata and collateral estoppel. *See Gray v. Gray*, 354 S.W.2d 948, 949 (Tex.Civ.App.-Houston 1962, writ dism'd) ("A suit for divorce presumes a valid marriage. At the trial on the merits the plaintiff must prove by a preponderance of the evidence that she was married to the defendant.") (citations omitted); *cf. Mossler v. Shields*, 818 S.W.2d 752, 753–54 (Tex.1991) (per curiam) (dismissal of divorce action with prejudice was res judicata as to plaintiff's claim of the existence of a common-law marriage). Moreover, in this very case appellee seeks to "give effect" to his marriage under Texas law by seeking a division of the parties' community property in the event they are unable to agree on a property division. Community property is a paradigmatic legal benefit that is associated intimately and solely with marriage. *See* Tex. Fam. Code Ann. § 3.002 ("Community property consists of the property, other than separate property, acquired by either spouse during marriage.").

Furthermore, a divorce proceeding would "give effect" to a same-sex marriage. The inherent nature of a divorce proceeding requires both a respondent

whom the petitioner seeks to divorce and a legally recognized relationship between the parties that the petitioner seeks to alter. An obvious purpose and function of the divorce proceeding is to determine and resolve legal obligations of the parties arising from or affected by their marriage. A person does not and cannot seek a divorce without simultaneously asserting the existence and validity of a lawful marriage. Texas law, as embodied in our constitution and statutes, requires that a valid marriage must be a union of one man and one woman, and only when a union comprises one man and one woman can there be a divorce under Texas law.

Appellee argues in the alternative that if the adjudication of his divorce action "gives effect" to a same-sex marriage, then the adjudication of a suit to declare his marriage void under section 6.307 of the family code would as well. Appellee points out that the family code authorizes the trial court to grant various forms of relief, such as temporary restraining orders and name changes, in any kind of suit for dissolution of marriage, whether the ultimate relief sought is a divorce, an annulment, or a declaration of voidness. *See* TEX. FAM.CODE ANN. §§ 6.501, 45.105(a) (Vernon 2006 & 2008). There is also some authority that courts may order property divisions in voidness suits. *See Hovious v. Hovious*, No. 2–04–169–CV, 2005 WL 555219, at *6 (Tex.App.-Fort Worth Mar. 10, 2005, pet. denied) (mem.op.). According to appellee, the State is trying to have

it both ways by arguing that these remedies impermissibly "give effect" to a same-sex marriage if they are pursued in a suit for divorce but do not "give effect" to a same-sex marriage if they are sought in a suit to declare a marriage void. We disagree. A decree of voidness does not "give effect" to the void marriage but, just the opposite, establishes that the parties to the ostensible but void marriage were never married for purposes of Texas law. Also, orders granting ancillary relief, such as restraining orders and name changes, do not amount to "giving effect" to the void marriage. In the context of a voidness proceeding, such orders do not recognize or effectuate a marriage between the parties, or even a claim to marital benefits. They merely facilitate the disentanglement of the parties' affairs when (1) they were never validly married in the eyes of Texas law and (2) at least one of the parties desires a judicial declaration to that effect.

We conclude that Texas courts have no subject-matter jurisdiction to adjudicate a divorce petition in the context of a same-sex marriage.[2] Thus, the trial court had no subject-matter jurisdiction to adjudicate appellee's petition for divorce.

**E. Comity**

Appellee argues that the trial court possesses subject-matter jurisdiction based on principles of comity because he was legally married in Massachusetts. Appellee further contends that Texas courts have long

---

**2.** We also note the decision in *Littleton v. Prange*, 9 S.W.3d 223 (Tex.App.-San Antonio 1999, pet. denied) (plurality op.). In *Littleton*, the San Antonio Court of Appeals held that a person who was born male, underwent a sex-change operation, and then ceremonially married another man was not validly married for purposes of standing to sue as a spouse under Texas's wrongful-death and survival statutes. *Id.* at 229–31. *Littleton* was decided before the adoption of section 6.204 of the

family code and article I, section 32 of the Texas Constitution, but the court still concluded that "Texas statutes do not allow same-sex marriages." *Id.* at 231. And in *Ross v. Goldstein*, the Houston Fourteenth Court of Appeals refused to recognize the "marriage-like relationship" doctrine in the same-sex context, relying on the Texas Constitution and family code for support. 203 S.W.3d 508, 514 (Tex.App.-Houston [14th Dist.] 2006, no pet.).

employed the comity-based "place-of-celebration rule" to determine whether a foreign marriage is valid for purposes of hearing a divorce, and that we should continue to apply that rule. He also cites cases from New York in which courts have entertained same-sex-divorce cases even though New York does not recognize same-sex marriages.

■■■■ "Comity is a principle under which the courts of one state give effect to the laws of another state or extend immunity to a sister sovereign not as a rule of law, but rather out of deference or respect." *Hawsey v. La. Dep't of Soc. Servs.*, 934 S.W.2d 723, 726 (Tex.App.-Houston [1st Dist.] 1996, writ denied); *accord* BLACK'S LAW DICTIONARY 284 (8th ed. 2004) (defining comity as "[a] practice among political entities (as nations, states, or courts of different jurisdictions), involving esp. mutual recognition of legislative, executive, and judicial acts"). "Because comity is grounded in cooperation and mutuality, Texas should extend comity by recognizing the laws and judicial decisions of other states unless: (1) the foreign state declines to extend comity to Texas or sister states under the same or similar circumstances; or (2) the foreign statute produces a result in violation of this state's own legitimate public policy." *Hawsey*, 934 S.W.2d at 726.

Appellee misconstrues the solidity of the place-of-celebration rule in Texas jurisprudence. In one of the more recent cases on point, the court rejected the place-of-celebration rule in favor of the most-substantial-relationship test and, based largely on Texas public policy, applied Texas law to ascertain the validity of marriages and divorces that took place in other countries. *Seth v. Seth*, 694 S.W.2d 459, 462–64 (Tex. App.-Fort Worth 1985, no writ). In neither of the two cases cited by appellee did a Texas court actually use the place-of-celebration rule to give effect to a marriage that was valid in the place of celebration but void in Texas. In one, the court enforced California's law refusing recognition of common-law marriages, thus rejecting the plaintiff's claim of common-law marriage to the extent it was based on conduct that took place in California. *See Braddock v. Taylor*, 592 S.W.2d 40, 42 (Tex.Civ. App.-Beaumont 1979, writ ref'd n.r.e.).[3] In the other, the question presented was whether a decedent had entered a valid common-law marriage with appellee Shelley Newman. *Durr v. Newman*, 537 S.W.2d 323, 325 (Tex.Civ.App.-El Paso 1976, writ ref'd n.r.e.). The appellant argued that the marriage was not valid under the place-of-celebration test because the only place Newman and decedent held themselves out as married was Nevada, which does not recognize common-law marriages. *Id.* at 326. The appellate court rejected the argument because the appellant had failed to prove the content of Nevada law properly in the trial court under the rules of procedure. *Id.* Thus, the court presumed that Nevada law was the same as Texas law, and the place-of-celebration rule was not essential to the case's disposition. *Id.* Moreover, we note

---

**3.** In *Braddock*, the question was whether decedent David Taylor was married to appellee Janice Taylor at the time of his death, as the trial court held. *Id.* at 41. The evidence showed that decedent was previously married to someone else and not divorced when he and Janice began holding themselves out as husband and wife in Texas. *Id.* at 42. Decedent and Janice then moved to California, which does not recognize common-law marriages, and continued their relationship. *Id.* Decedent divorced his prior wife, and then he died. *Id.* "Since no marriage between the deceased and appellee was ever contracted or celebrated in California, nor contracted in Texas after the impediment was removed," the trial court erred by holding that Janice was decedent's wife and heir. *Id.*

that the place-of-celebration rule seems contrary to the family code's general choice-of-law provision: "The law of this state applies to persons married elsewhere who are domiciled in this state." Tex. Fam.Code Ann. § 1.103.

Moreover, Texas has repudiated the place-of-celebration rule with respect to same-sex unions on public-policy grounds. The Texas Constitution provides that "[m]arriage in this state shall consist only of the union of one man and one woman." Tex. Const. art. I, § 32(a). The rule contains no exceptions for marriages performed in other jurisdictions, nor is its application limited to marriages performed in this state. Any common-law principle recognizing same-sex marriages performed in other jurisdictions must yield to the constitution. Moreover, the legislature has declared that same-sex marriages are contrary to Texas public policy. Tex. Fam. Code Ann. § 6.204(b). We do not extend comity to the laws of other states if doing so would result in a violation of Texas public policy. *K.D.F. v. Rex,* 878 S.W.2d 589, 595 (Tex.1994); *Hawsey,* 934 S.W.2d at 726; *see also Larchmont Farms, Inc. v. Parra,* 941 S.W.2d 93, 95 (Tex.1997) (per curiam) ("The basic rule is that a court need not enforce a foreign law if enforcement would be contrary to Texas public policy."). The Supreme Court has also indicated that a state may invoke statutory voidness to deny comity to a marriage performed in another state. *Loughran v. Loughran,* 292 U.S. 216, 223, 54 S.Ct. 684, 78 L.Ed. 1219 (1934) ("Marriages not polygamous or incestuous, *or otherwise declared void by statute,* will, if valid by the law of the state where entered into, be recognized as valid in every other jurisdiction.") (emphasis added) (footnote omitted). Accordingly, we conclude that neither comity nor the place-of-celebration rule overcome the jurisdictional bar of section 6.204(c)(2).

Appellee has referred us to several recent New York cases that reach a different result, but Texas's specific constitutional and statutory provisions addressing same-sex marriage make those cases inapposite. New York has no legislation or constitutional amendment specifically declaring that same-sex marriages are against the public policy of the state. *See C.M. v. C.C.,* 21 Misc.3d 926, 867 N.Y.S.2d 884, 886 (Sup.Ct.2008) ("[T]he New York State legislature has not enacted any statute that would prohibit recognition of a same sex marriage from another jurisdiction, nor is there any constitutional amendment barring recognition of such marriages."). Rather, its highest court has inferred that New York's general marriage statutes, adopted in 1909, limit marriage to opposite-sex couples. *Hernandez v. Robles,* 7 N.Y.3d 338, 821 N.Y.S.2d 770, 855 N.E.2d 1, 6 (2006). Because New York has no clear declaration of a public policy forbidding same-sex marriages, some New York courts have relied on comity to extend recognition to same-sex marriages performed in other jurisdictions for the purpose of entertaining divorce actions. *See, e.g., Beth R. v. Donna M.,* 19 Misc.3d 724, 853 N.Y.S.2d 501, 504, 506 (Sup.Ct.2008) (relying on comity to deny defendant's motion to dismiss same-sex-divorce action); *accord C.M.,* 867 N.Y.S.2d at 889; *see also Dickerson v. Thompson,* 73 A.D.3d 52, 897 N.Y.S.2d 298, 299 (2010) (holding that New York courts have subject-matter jurisdiction to entertain suits to dissolve same-sex civil unions entered in another jurisdiction). But, as the court noted in *Beth R.,* comity governs the recognition of out-of-state marriages only in the absence of "overriding legislation." 853 N.Y.S.2d at 504. We have just such overriding legislation in Texas, where the constitution expressly limits "marriage" to opposite-sex couples, section 6.204(b) of the family code

declares same-sex marriages to be contrary to public policy, and section 6.204(c) denies legal effect to same-sex marriages even if contracted in another jurisdiction. Thus, the New York cases relied on by appellee are inapposite.[4]

## F. Conclusion

■ We hold that Texas courts lack subject-matter jurisdiction to entertain a suit for divorce that is brought by a party to a same-sex marriage, even if the marriage was entered in another state that recognizes the validity of same-sex marriages. We must therefore proceed to consider whether the Texas laws compelling this result offend the Constitution.

## V. TEXAS LAW DOES NOT VIOLATE THE EQUAL PROTECTION CLAUSES OF THE FOURTEENTH AMENDMENT

The question presented is whether Texas law proscribing the adjudication of a petition for divorce by a party to a same-sex marriage violates the Equal Protection Clause of the Fourteenth Amendment.

### A. The Equal Protection Clause of the Fourteenth Amendment

■ The Equal Protection Clause provides, "No State shall ... deny to any person within its jurisdiction the equal protection of the laws." U.S. CONST. amend. XIV, § 1. It is "essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 439, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985). On the other hand, "the equal protection of the laws must coexist with

the practical necessity that most legislation classifies for one purpose or another, with resulting disadvantage to various groups or persons." *Romer v. Evans*, 517 U.S. 620, 631, 116 S.Ct. 1620, 134 L.Ed.2d 855 (1996). Consequently, disparate treatment of different but similarly situated groups does not automatically violate equal protection. *Dallas Transit Sys. v. Mann*, 750 S.W.2d 287, 291 (Tex.App.-Dallas 1988, no writ). To reconcile the equal-protection principle with practical necessity, the Court has developed differing levels of judicial scrutiny depending on the kind of classification at issue, which we analyze below. First, however, we address the State's contention that the equal-protection issue has already been squarely decided by the United States Supreme Court in *Baker v. Nelson*, 409 U.S. 810, 93 S.Ct. 37, 34 L.Ed.2d 65 (1972). Ultimately, we conclude that Texas law does not violate equal protection.

### B. *Baker v. Nelson*

The State contends that appellee's equal-protection challenge is completely foreclosed by the United States Supreme Court's 1972 decision in *Baker v. Nelson*. That case began as a suit in Minnesota state court in which two men sued for the right to obtain a marriage license. *Baker v. Nelson*, 291 Minn. 310, 191 N.W.2d 185, 185 (1971), *dism'd*, 409 U.S. 810, 93 S.Ct. 37, 34 L.Ed.2d 65 (1972). The petitioners argued that they were entitled to a marriage license under Minnesota law and, alternatively, that a law permitting only opposite-sex marriages denied them due

---

4. In contrast to the New York cases, courts in other jurisdictions have held that they lack jurisdiction to dissolve same-sex marriages or civil unions despite the validity of those unions in the jurisdictions where they were celebrated. *See Rosengarten v. Downes*, 71 Conn. App. 372, 802 A.2d 170, 184 (Conn.App.Ct.),

*appeal dism'd as moot*, 261 Conn. 936, 806 A.2d 1066 (2002); *Kern*, 11 Pa. D. & C.5th at 576; *Chambers v. Ormiston*, 935 A.2d 956, 958, 967 (R.I.2007). Like the New York cases, these cases are of limited usefulness because Texas's marriage laws differ from those at issue in those cases.

process and equal protection. *Id.* at 185–86. The trial court denied relief, and the Minnesota Supreme Court affirmed. That court held that Minnesota law prohibited same-sex marriages and that this prohibition did not violate petitioners' due-process and equal-protection rights. *Id.* at 185–87. On further appeal to the United States Supreme Court, the Court dismissed the appeal "for want of a substantial federal question." 409 U.S. at 810, 93 S.Ct. 37. The State argues that this dismissal constituted a rejection of the petitioners' equal-protection claim on the merits. Because there is no Supreme Court precedent overruling *Baker,* the State concludes, we must reject appellee's equal-protection claim. Appellee makes several arguments in response. He distinguishes *Baker* because it involved an application for a marriage license, while his claim involves a request for a divorce. And he contends that *Baker* has been "fatally undermined" by subsequent cases.[5]

■ A summary disposition by the Supreme Court has very narrow precedential effect. Specifically, that precedential effect "can extend no farther than the precise issues presented and necessarily decided by" the Court's action. *Ill. State Bd. of Elections v. Socialist Workers Party,* 440 U.S. 173, 182, 99 S.Ct. 983, 59 L.Ed.2d 230 (1979) (internal quotations omitted); *see also Mandel v. Bradley,* 432 U.S. 173, 176, 97 S.Ct. 2238, 53 L.Ed.2d 199 (1977) (per curiam) (stating that summary dismissals "prevent lower courts from coming to opposite conclusions on the precise issues presented and necessarily decided" by the Court). Thus, a summary disposition has "considerably less precedential value than an opinion on the merits." *Ill. State Bd. of Elections,* 440 U.S. at 180–81, 99 S.Ct. 983.

■ The issue presented in this case is distinguishable from the precise issues presented to and decided by the Supreme Court in *Baker.* The jurisdictional statement in *Baker* posed three questions to the Court:

1. Whether appellee's refusal to sanctify appellants' marriage deprives appellants of their liberty to marry and of their property without due process of law under the Fourteenth Amendment.

2. Whether appellee's refusal, pursuant to Minnesota marriage statutes, to sanctify appellants' marriage because both are of the male sex violates their rights under the equal protection clause of the Fourteenth Amendment.

3. Whether appellee's refusal to sanctify appellants' marriage deprives appellants of their right to privacy under the Ninth and Fourteenth Amendments.[6]

In all three issues, the *Baker* appellants argued that the Constitution compelled Minnesota to grant them a marriage li-

---

5. Appellee also asserts that "neither the parties nor the Court in *Baker* had even conceived of Equal Protection or Due Process claims on the basis of sexual orientation." This statement is at odds with appellee's assertion two pages earlier in his brief that the *Baker* petitioner argued "that a state could not constitutionally refuse to marry same-sex couples under either the Due Process or Equal Protection clauses of the Fourteenth Amendment."

6. The State attached a copy of the appellants' jurisdictional statement in *Baker* to its brief in this appeal. Ordinarily we do not consider matters outside the record. *In re Estate of Bendtsen,* 230 S.W.3d 823, 830 (Tex.App.-Dallas 2007, pet. denied). But appellee has not objected, and other courts have quoted the jurisdictional statement in *Baker* to similar effect. *See, e.g., In re Kandu,* 315 B.R. 123, 137 (Bankr.W.D.Wash.2004).

cense and treat them as a married couple from then on. In the instant case, by contrast, appellee does not complain of Texas's refusal to recognize his marriage to H.B. on a going-forward basis. His complaint is that Texas law relegates him to a declaration of voidness, when a party to an opposite-sex marriage in otherwise similar circumstances would be entitled to a divorce.

*Baker* is certainly relevant because it reaffirms the states' preeminent role in the area of family law, and we accord *Baker* appropriate weight in our analysis of the equal-protection issue. But because *Baker* is distinguishable, we conclude that it does not control the disposition of the equal-protection issue presented in this case. *Cf. Smelt v. Cnty. of Orange,* 374 F.Supp.2d 861, 872–74 (C.D.Cal.2005) (concluding *Baker v. Nelson* did not control outcome of constitutional challenge to federal DOMA), *aff'd in part and vacated in part on other grounds,* 447 F.3d 673 (9th Cir.2006); *In re Kandu,* 315 B.R. 123, 138 (Bankr.W.D.Wash.2004) (same). *But see Wilson v. Ake,* 354 F.Supp.2d 1298, 1304–05 (M.D.Fla.2005) (concluding that *Baker* was binding in challenge to constitutionality of Florida statute prohibiting same-sex marriage).

## C. The Standard: Strict Scrutiny or Rational Basis

 An equal-protection challenge is examined under one of two tests: the strict-scrutiny test or the rational-basis test. *City of Cleburne,* 473 U.S. at 439–40, 105 S.Ct. 3249; *Cannady v. State,* 11 S.W.3d 205, 215 (Tex.Crim.App.2000); *Kiss v. State,* 316 S.W.3d 665, 668–69 (Tex. App.-Dallas 2009, pet. ref'd). Appellee urges the former. Strict scrutiny applies if a law discriminates against a suspect class or interferes with a fundamental right. *Kiss,* 316 S.W.3d at 668–69; *Dill v. Fowler,* 255 S.W.3d 681, 683 (Tex.App.-

Eastland 2008, no pet.). "[I]f a law neither burdens a fundamental right nor targets a suspect class, we will uphold the legislative classification so long as it bears a rational relation to some legitimate end." *Romer,* 517 U.S. at 631, 116 S.Ct. 1620; *accord Kiss,* 316 S.W.3d at 668–69.

The Supreme Court has described a "suspect class" as one "saddled with such disabilities, or subjected to such a history of purposeful unequal treatment, or relegated to such a position of political powerlessness as to command extraordinary protection from the majoritarian political process." *Mass. Bd. of Ret. v. Murgia,* 427 U.S. 307, 313, 96 S.Ct. 2562, 49 L.Ed.2d 520 (1976) (per curiam) (internal quotations omitted) (holding that rational-basis test applied to mandatory police retirement age). Examples of recognized suspect classes are classes defined by race, alienage, and ancestry. *Hookie v. State,* 136 S.W.3d 671, 679 n. 9 (Tex.App.-Texarkana 2004, no pet.).

"[T]he Supreme Court has never ruled that sexual orientation is a suspect classification for equal protection purposes." *Citizens for Equal Prot. v. Bruning,* 455 F.3d 859, 866 (8th Cir.2006); *see also Johnson v. Johnson,* 385 F.3d 503, 532 (5th Cir. 2004) ("Neither the Supreme Court nor this court has recognized sexual orientation as a suspect classification...."). The parties cite no authority from Texas's two highest courts on point, and we have found none. Many courts in other jurisdictions have addressed the issue and held that homosexuals are not a suspect class for equal-protection purposes. *See, e.g., Citizens for Equal Prot.,* 455 F.3d at 866–67; *Lofton v. Sec'y of Dep't of Children & Family Servs.,* 358 F.3d 804, 818 (11th Cir.2004); *Smelt,* 374 F.Supp.2d at 875; *see also Conaway v. Deane,* 401 Md. 219,

932 A.2d 571, 606 (2007) (analyzing claims under Maryland Constitution).

■ Appellee poses several arguments in support of his position that homosexuals should be designated a suspect class. Appellee, citing *Bowen v. Gilliard*, 483 U.S. 587, 107 S.Ct. 3008, 97 L.Ed.2d 485 (1987), asserts that homosexuals "have long been persecuted." In *Bowen*, the Court, applying the rational-basis test, held that AFDC child support attribution requirements did not violate due process or equal protection. *Id.* at 598–603, 107 S.Ct. 3008. *Bowen* is significantly removed from, and does not support, the proposition for which it is cited. Next, appellee, citing *Lawrence v. Texas*, 539 U.S. 558, 123 S.Ct. 2472, 156 L.Ed.2d 508 (2003), asserts that "for centuries there have been powerful voices to condemn homosexual conduct as immoral." *See id.* at 571, 123 S.Ct. 2472. In *Lawrence*, the Court held that a Texas statute making it a crime for two persons of the same sex to engage in certain intimate sexual conduct was unconstitutional, in violation of the Due Process Clause of the Fourteenth Amendment. *Id.* at 578–79, 123 S.Ct. 2472. According to the Court, "there is *no* longstanding history in this country of laws directed at homosexual conduct as a distinct matter." *Id.* at 568, 123 S.Ct. 2472 (emphasis added). *Lawrence* does not support appellee's position that homosexuals should be designated a suspect class.

Appellee has not shown that Texas generally excludes homosexuals from the protections of its laws. In fact, appellee pointed out in the trial court that persons in same-sex relationships appear to be eligible to seek protective orders from domestic violence, thus undermining his own position. *See* TEX. FAM.CODE ANN. § 82.002(b) (Vernon 2008) (permitting an adult member of a "dating relationship" to seek a protective order against violence, without regard to the sex of the members of the relationship).

Appellee argues that homosexuals are a politically powerless minority. This contention is presented without relevant authority or analysis, and we therefore reject it. We are aware of significant authority to the contrary. *See Romer*, 517 U.S. at 652, 116 S.Ct. 1620 (Scalia, J., dissenting) (noting that forty-six percent of voters opposed Colorado's Amendment 2, even though homosexuals composed no more than four percent of the population); *Strauss v. Horton*, 46 Cal.4th 364, 93 Cal. Rptr.3d 591, 207 P.3d 48, 59, 68 (2009) (noting that over forty-seven percent of voters opposed referendum limiting marriage to opposite-sex couples). Like the Maryland court in *Conaway*, "we are not persuaded that gay, lesbian, and bisexual persons are so politically powerless that they are entitled to extraordinary protection from the majoritarian political process." 932 A.2d at 611 (internal quotations omitted).

Appellee also argues that homosexuals are a suspect class because they bear "obvious, immutable, or distinguishing characteristics that define them as a discrete group." However, appellee does not identify or attempt to suggest the exact nature of such characteristics. Again, this contention is presented without relevant authority or analysis, and we therefore reject it.

Citing *City of Cleburne*, appellee asserts that strict scrutiny is justified because sexual orientation has no bearing on a person's ability to "perform or contribute to society." In *City of Cleburne*, the Supreme Court explained that legal classifications based on gender and illegitimacy call for heightened scrutiny because those attributes generally do not affect a person's ability to contribute to society, thus making such classifications inherently sus-

pect. 473 U.S. at 440–41, 105 S.Ct. 3249. In the same opinion, however, the Court observed that rational-basis scrutiny is generally appropriate when the "individuals in the group affected by a law have distinguishing characteristics relevant to interests the State has the authority to implement." *Id.* at 441, 105 S.Ct. 3249. The persons singled out and favored by Texas's marriage laws, namely opposite-sex couples, have such a distinguishing and relevant characteristic: the natural ability to procreate. The state's interest in "fostering relationships that will serve children best" is a legitimate interest within the state's authority to regulate. *Hernandez*, 855 N.E.2d at 11; *see also Conaway*, 932 A.2d at 630 ("[S]afeguarding an environment most conducive to the stable propagation and continuance of the human race is a legitimate government interest."). Thus, although a person's sexual orientation does not affect his or her ability to contribute to society in general, it does bear on whether he or she will enter a relationship that is naturally open to procreation and thus trigger the state's legitimate interest in child-rearing. *See Hernandez*, 855 N.E.2d at 11 (concluding that rational-basis scrutiny was appropriate in part because same-sex relationships "cannot lead to the birth of children"). Accordingly, *City of Cleburne* does not support appellee's contention that homosexuals are a suspect class.[7]

We conclude that homosexuals are not a suspect class, that persons who choose to marry persons of the same sex are not a suspect class, and that the Texas law at issue in this case does not discriminate against a suspect class.

■ Fundamental rights are rights that are "deeply rooted in this Nation's history and tradition" and are "implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed." *Washington v. Glucksberg*, 521 U.S. 702, 720–21, 117 S.Ct. 2258, 138 L.Ed.2d 772 (1997) (internal quotations omitted).[8] In order to ascertain whether a claimed right is indeed fundamental, we must engage in a "careful description of the asserted fundamental liberty interest." *Id.* at 721, 117 S.Ct. 2258 (internal quotations omitted). We do not accept uncritically the description of the right proffered by the party asserting the right. In *Glucksberg*, for instance, the respondents described the claimed right as the "liberty to choose how to die" and the right to "control of one's final days," but the Supreme Court examined the statute under challenge and concluded that the asserted right was more precisely described as "a right to commit suicide which itself includes a right to assistance in doing so." *Id.* at 722, 723, 117 S.Ct. 2258. Accordingly, we must first define the right asserted by appellee.

Appellee characterizes the rights in question as the "freedom to marry a person of one's own choosing" and the concomitant right to end such a marriage with a divorce. He points out that the Supreme

---

7. In *City of Cleburne,* the Court held that mentally retarded persons are not a suspect class, and that a zoning ordinance requiring a special use permit for homes for the mentally retarded failed the rational-basis test. 473 U.S. at 442–50, 105 S.Ct. 3249.

8. Although *Glucksberg* is a due-process case rather than an equal-protection case, the test for ascertaining whether a claimed right is a "fundamental" right that triggers strict scrutiny is the same under both clauses. *See Lofton,* 358 F.3d at 811–18 (performing single fundamental-right analysis to dispose of both due-process and equal-protection challenges); *see also* 2 Ronald D. Rotunda & John E. Nowak, Treatise on Constitutional Law: Substance and Procedure §§ 15.4(a), 15.7 (4th ed. 2007) (discussing law of fundamental rights).

Court has indicated that the right to marry is a fundamental right. *See Loving v. Virginia*, 388 U.S. 1, 12, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967) (describing marriage as a "fundamental freedom" that may "not be restricted by invidious racial discriminations"); *accord Glucksberg*, 521 U.S. at 719, 117 S.Ct. 2258 (citing *Loving* as establishing fundamental right to marry); *Skinner v. Oklahoma ex rel. Williamson*, 316 U.S. 535, 541, 62 S.Ct. 1110, 86 L.Ed. 1655 (1942) ("Marriage and procreation are fundamental to the very existence and survival of the race."). But *Loving* involved a marriage between a man and woman. The *Loving* opinion's discussion of the right to marry does not embrace the broad formulation proposed by appellee. *See Evans v. Romer*, 854 P.2d 1270, 1301 (Colo.1993) (Erickson, J., dissenting) ("[R]ather than expressing a willingness to extrapolate new fundamental rights based on selective language from prior Supreme Court decisions, we should exercise caution in identifying and embracing previously unrecognized fundamental rights."). Many courts in other jurisdictions have confronted similar challenges to the federal DOMA and similar state laws, and they have generally concluded that the right being claimed should be defined and analyzed precisely as the right to marry a person of the same sex, not as the right to marry whomever one chooses. *See, e.g., Smelt*, 374 F.Supp.2d at 877–79; *In re Kandu*, 315 B.R. at 138–41; *Conaway*, 932 A.2d at 616–24; *Hernandez*, 855 N.E.2d at 9–10; *Andersen v. King Cnty.*, 158 Wash.2d 1, 138 P.3d 963, 976–79 (2006) (plurality op.). The *Conaway* court's thorough discussion of the question demonstrates that the Supreme Court's right-to-marry jurisprudence has always involved opposite-sex couples and that the Court has always

justified the fundamental nature of the right to marry, at least in part, by reference to procreation. *Conaway*, 932 A.2d at 619–21. We agree with that analysis and conclude that the precise rights claimed by appellee are the right to marry a person of the same sex and the concomitant right to divorce.

"[T]he limitation of marriage to one man and one woman preserves both its structure and its historic purposes." *Goodridge v. Dep't of Pub. Health*, 440 Mass. 309, 798 N.E.2d 941, 992 n. 13 (2003) (Cordy, J., dissenting). Accurately identifying and analyzing appellee's claimed right—the purported "right to marry a person of the same sex"—exposes the serious consequences such a position portends: the redefinition of the fundamental institution of marriage. And, of course, only by asserting that marriage includes the union of two persons of the same sex can appellee advance his claim of discrimination. A fatal flaw in this position is that it assumes the truth of the proposition to be proved.[9]

Having concluded that the claimed right in question is properly defined as the right to marry a person of the same sex, we consider whether that right is " 'deeply rooted in this Nation's history and tradition.' " *Glucksberg*, 521 U.S. at 721, 117 S.Ct. 2258 (quoting *Moore v. E. Cleveland*, 431 U.S. 494, 503, 97 S.Ct. 1932, 52 L.Ed.2d 531 (1977) (plurality op.)). Plainly, it is not. Until 2003, no state recognized same-sex marriages. *Smelt*, 374 F.Supp.2d at 878. Congress and most states have adopted legislation or constitutional amendments explicitly limiting the institution of marriage to opposite-sex unions. *Conaway*, 932 A.2d at 627. We agree with the numerous courts that have held that the right to legal recognition of a same-sex marriage is not a fundamental

---

**9.** In legal analysis, as in mathematics, it is fundamentally erroneous to assume the truth of the very thing to be proved. *Goodridge*, 798 N.E.2d at 984 n. 2 (Cordy, J., dissenting).

right for equal-protection purposes. *See, e.g., Smelt,* 374 F.Supp.2d at 879; *Wilson,* 354 F.Supp.2d at 1307; *In re Kandu,* 315 B.R. at 140–41; *Standhardt v. Superior Court,* 206 Ariz. 276, 77 P.3d 451, 458–60 (Ariz.Ct.App.2003); *see also Conaway,* 932 A.2d at 629 (analyzing claims under Maryland Constitution); *Hernandez,* 855 N.E.2d at 10 (analyzing claims under New York Constitution); *Andersen,* 138 P.3d at 979 (analyzing claims under Washington Constitution and noting that *"no appellate court applying a federal constitutional analysis"* has found a fundamental right to marry a person of the same sex); *see also Goodridge,* 798 N.E.2d at 987 (Cordy, J., dissenting) ("While the institution of marriage is deeply rooted in the history and traditions of our country and our State, the right to marry someone of the same sex is not."). *But see Perry v. Schwarzenegger,* 704 F.Supp.2d 921, 993–94 (N.D.Cal.2010) (holding that same-sex couples were seeking to exercise the fundamental right to marry), *appeal docketed,* No. 10–16696, 2010 WL 3212786 (9th Cir. Aug. 5, 2010). We conclude that the legislation in question does not interfere with a fundamental right.

Because Texas's laws stripping the courts of jurisdiction to adjudicate claims for same-sex divorce do not discriminate against a suspect class or burden a fundamental right, we evaluate the law under the rational-basis test.

## D. Application of Rational–Basis Standard

■ The link between the classification adopted and the object to be attained affords substance to the Equal Protection Clause. *Romer,* 517 U.S. at 632, 116 S.Ct. 1620. As emphasized by the Supreme Court, "[i]n the ordinary case, a law will be sustained if it can be said to advance a legitimate government interest, even if the law seems unwise or works to the disadvantage of a particular group, or if the rationale for it seems tenuous." *Id.* The link—or rational relationship—ensures that the classification is not drawn with the express purpose of disadvantaging any group burdened by the law. *Id.* at 633, 116 S.Ct. 1620. In short, "a law must bear a rational relationship to a legitimate governmental purpose." *Id.* at 635, 116 S.Ct. 1620.

■ Under the rational-basis test, a statute enjoys a strong presumption of validity, and the statute must be upheld if there is any reasonably conceivable state of facts that could provide a rational basis for the classification. *Heller v. Doe ex rel. Doe,* 509 U.S. 312, 319–20, 113 S.Ct. 2637, 125 L.Ed.2d 257 (1993); *In re G.C.,* 66 S.W.3d 517, 524 (Tex.App.-Fort Worth 2002, no pet.). "[T]he judiciary may not sit as a superlegislature to judge the wisdom or desirability of legislative policy determinations made in areas that neither affect fundamental rights nor proceed along suspect lines." *City of New Orleans v. Dukes,* 427 U.S. 297, 303, 96 S.Ct. 2513, 49 L.Ed.2d 511 (1976) (per curiam). The party attacking the rationality of the legislative classification bears the burden of negating every conceivable basis that might support it. *Fed. Commc'ns Comm'n v. Beach Commc'ns, Inc.,* 508 U.S. 307, 314–15, 113 S.Ct. 2096, 124 L.Ed.2d 211 (1993). Moreover, the classification adopted by the legislature need not be perfectly tailored to its purpose in order to pass constitutional muster:

> [A] State does not violate the Equal Protection Clause merely because the classifications made by its laws are imperfect. If the classification has some reasonable basis, it does not offend the Constitution simply because the classification is not made with mathematical nicety or because in practice it results in

some inequality. The problems of government are practical ones and may justify, if they do not require, rough accommodations—illogical, it may be, and unscientific. A statutory discrimination will not be set aside if any state of facts reasonably may be conceived to justify it.

*Kiss,* 316 S.W.3d at 668 (quoting *Dandridge v. Williams,* 397 U.S. 471, 485, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970)). Finally, states have traditionally enjoyed wide latitude in prescribing "the conditions upon which the marriage relation between its own citizens shall be created, and the causes for which it may be dissolved." *Citizens for Equal Prot.,* 455 F.3d at 867 (quoting *Pennoyer v. Neff,* 95 U.S. 714, 734–35, 24 L.Ed. 565 (1878)). "In this constitutional environment, rational-basis review must be particularly deferential." *Id.*

Several courts have concluded that laws limiting the benefits of marriage to opposite-sex couples do not offend equal protection. *Id.* at 868–69; *Smelt,* 374 F.Supp.2d at 879–80; *Wilson,* 354 F.Supp.2d at 1308–09; *Standhardt,* 77 P.3d at 465; *see also Morrison v. Sadler,* 821 N.E.2d 15, 21–31 (Ind.Ct.App.2005) (plurality op.) (analyzing equal-protection claim under Indiana Constitution); *Conaway,* 932 A.2d at 634 (analyzing equal-protection claim under Maryland Constitution); *Hernandez,* 855 N.E.2d at 12 (analyzing equal-protection claim under New York Constitution); *Andersen,* 138 P.3d at 985 (analyzing equal-protection claim under Washington Constitution). *But see Perry,* 704 F.Supp.2d at 1003–04 (reaching opposite result). We agree with those courts that have found no equal-protection violation. The state has a

legitimate interest in promoting the raising of children in the optimal familial setting. It is reasonable for the state to conclude that the optimal familial setting for the raising of children is the household headed by an opposite-sex couple. *Andersen,* 138 P.3d at 983; *see also Goodridge,* 798 N.E.2d at 999–1000 (Cordy, J., dissenting) ("[T]he Legislature could rationally conclude that a family environment with married, opposite-sex parents remains the optimal social structure in which to bear children . . . .").[10]

We next consider whether Texas's marriage laws are rationally related to the goal of promoting the raising of children in households headed by opposite-sex couples. We conclude that they are. Because only relationships between opposite-sex couples can naturally produce children, it is reasonable for the state to afford unique legal recognition to that particular social unit in the form of opposite-sex marriage. *See Standhardt,* 77 P.3d at 462–63 ("The State could reasonably decide that by encouraging opposite-sex couples to marry, thereby assuming legal and financial obligations, the children born from such relationships will have better opportunities to be nurtured and raised by two parents within long-term, committed relationships, which society has traditionally viewed as advantageous for children."); *Andersen,* 138 P.3d at 982 ("[N]o other relationship has the potential to create, without third party involvement, a child biologically related to both parents, and the legislature rationally could decide to limit legal rights and obligations of marriage to opposite-sex couples."). The legislature could reasonably conclude that the institution of civil

10. Supporters of the amendment that became article I, section 32 of the Texas Constitution argued, "A traditional marriage consisting of a man and a woman is the basis for a healthy, successful, stable environment for children. It is the surest way for a family to enjoy good health, avoid poverty, and contribute to their community." House Comm. on State Affairs, Bill Analysis, Tex. H.J.R. 6, 79th Leg., R.S. (2005).

marriage as it has existed in this country from the beginning has successfully provided this desirable social structure and should be preserved. *See Goodridge,* 798 N.E.2d at 998 (Cordy, J., dissenting). The state also could have rationally concluded that children are benefited by being exposed to and influenced by the beneficial and distinguishing attributes a man and a woman individually and collectively contribute to the relationship. *See Hernandez,* 855 N.E.2d at 7 ("The Legislature could rationally believe that it is better, other things being equal, for children to grow up with both a mother and a father. Intuition and experience suggest that a child benefits from having before his or her eyes, every day, living models of what both a man and a woman are like."); Lynn D. Wardle, Essay, *"Multiply and Replenish": Considering Same–Sex Marriage in Light of State Interests in Marital Procreation,* 24 HARV. J.L. & PUB. POL'Y 771, 780 (2001) ("Heterosexual marriage reasonably may be assumed to provide the most advantageous environment in which children can be reared, providing profound benefits of dual gender parenting to model intergender relations and show children how to relate to persons of their own and the opposite gender.").

The Texas Constitution and the Texas Family Code single out one particular social unit for purposes of defining a legally valid marriage in Texas: opposite-sex couples. Appellee asserts that because Texas law thus both defines and restricts formal recognition of the institution of marriage to opposite-sex couples, it thereby discriminates against and denigrates same-sex couples. We disagree. Texas law recognizes that only opposite-sex couples are naturally capable of producing children, and it gives participants in that kind of relationship the option of legal formalization, with the legitimate legislative goal of encouraging such formalization and there-

by promoting the well-being of children. The state has decided that the general welfare does not require extending the same option to the members of other social units. Texas law does not recognize same-sex relationships as valid marriages. Texas law also does not recognize relationships that involve more than one man and one woman, such as bigamous and polygamous relationships (both of which involve at least one person of the opposite sex), as valid marriages. *See* TEX. FAM.CODE ANN. § 6.202 (voiding marriage during existence of prior marriage); TEX. PENAL CODE ANN. § 25.01 (Vernon Supp.2009) (criminalizing bigamy). Appellee has not shown that the legislative history of the 2005 constitutional amendment defining marriage in Texas as limited to opposite-sex couples reflects any animus against same-sex couples. We cannot conclude that the State's justification for its marriage laws lacks a rational relationship to legitimate state interests.

Appellee asserts there is a sharp distinction between the right to marriage and the right to divorce. While each is different, the difference does not advance appellee's position. The laws specific to proceedings for divorce in Texas are an integral part of the State's overall scheme to give special protections and benefits to married couples. Divorce is a mechanism for determining and resolving the legal obligations of the parties arising from or affected by their marriage. The State may reasonably conclude that provisions must be made for the peaceable resolution of irreconcilable disputes and the legal dissolution of the marital bond when its continuance would hinder rather than promote the goals of the marriage laws.

Appellee argues that a voidance action is not an adequate substitute for a divorce action in his case. He contends that he might not be able to pursue an action to declare his marriage void under section

6.307 because the State contends that he is not a party to a "marriage" at all. He purports to fear that the State would intervene in a suit for voidness and claim that the trial court lacks jurisdiction of that action as well. This argument is without merit. Section 6.307 provides, "Either party to a marriage made void by this chapter may sue to have the marriage declared void[.]" TEX. FAM.CODE ANN. § 6.307(a). Same-sex marriages are made void by "this chapter," i.e., by section 6.204(b) of chapter 6 of the family code. Thus, appellee could bring a suit to declare his marriage to H.B. void.

Appellee argues that certain forms of relief, such as spousal maintenance, are available in divorce actions and not in voidance actions. He also argues that other benefits, like the spousal-communication privilege and the community-property laws, will not be available to him if he pursues a voidance action. These arguments are merely policy arguments that it would be better if the state gave same-sex couples the same marriage-related rights as opposite-sex couples. We have already concluded that the state may constitutionally treat opposite-sex couples differently from all other social units for purposes of marriage and divorce laws. Appellee's arguments that he should be afforded rights such as the spousal-communications privilege and community-property rights must be addressed to the Texas Legislature.

Appellee argues that a declaration of voidness is not an adequate substitute for a divorce decree because other jurisdictions might not recognize a declaration of voidness as terminating his marriage to H.B. He points out that there is a lack of precedent showing that a declaration of voidness would be given full faith and credit by other states. He also argues that the wording of section 6.204(b) implies that a Texas declaration of voidness would

have no effect outside of Texas because section 6.204(b) provides that a same-sex marriage is "void in this state." *Id.* § 6.204(b). The other statutes in the void-marriage subchapter of the family code provide that the defined marriages are simply "void." *See, e.g., id.* § 6.201 ("A marriage is void if one party to the marriage is related to the other [by specified blood or adoptive relationships]."). We disagree with appellee's contention. Section 6.307 is the provision that confers jurisdiction on the courts to declare any marriage void, and it does not contain the words "in this state" that appellee finds problematic in section 6.204(b). Under section 6.307, "[e]ither party to a marriage made void by this chapter may sue to have the marriage declared void"—not "void in this state." *See id.* § 6.307(a). We reject appellee's contention that a declaration of voidness in his case would not be effective in other jurisdictions as well. We also note, as the State points out, that in this case a decree of divorce would actually create greater uncertainty than a declaration of voidness, in light of existing Texas authority that a divorce decree would be void and subject to collateral attack. *See Mireles,* 2009 WL 884815, at *2 (affirming trial court's judgment that sustained collateral attack on same-sex divorce decree).

Citing a number of other sections of the family code relating to void marriages, appellee contends that Texas law treating "same-sex marriages" as void stigmatizes him. He argues that by declaring same-sex marriages void, Texas has placed them in the "odious company" of unions that have traditionally been deemed "criminal almost by their very nature," such as incestuous and bigamous marriages. The "guilt by association" caused by this juxtaposition, appellee contends, stigmatizes same-sex couples.

Section 6.204 regarding same-sex marriages constitutes a separate and independent provision within the family code. It does not act in concert with the other provisions enumerated by appellee dealing with void marriages, all of which involve significantly different situations.[11] Appellee's criticism thus attacks the location of this provision amid other provisions in the code that address other void marriages. Appellee's strained comparison based upon the placement of section 6.204 within the family code not only misconstrues the meaning of section 6.204 but also suggests an effort by appellee to transform his social situation into one of self-imposed ignominy.

Appellee relies on *Romer* and *Lawrence.* In *Lawrence,* the Supreme Court held that statutes criminalizing homosexual sodomy violate the Due Process Clause. 539 U.S. at 578–79, 123 S.Ct. 2472. In *Romer,* the Court held that equal protection was violated by a state constitutional amendment forbidding the state or any of its subdivisions from giving protected status to any group defined by homosexual or bisexual orientation or activity. 517 U.S. at 635–36, 116 S.Ct. 1620.

The Court struck down the constitutional amendment at issue in *Romer* because it was "inexplicable by anything but animus toward the class it affects" and the Court could not conceive of a single proper legislative end advanced by the amendment. *Id.* at 632, 635, 116 S.Ct. 1620. Texas's laws governing marriage and divorce, by contrast, are rationally related to the legitimate state interest in fostering the best possible environment for procreation and child-raising. Appellee has not demonstrated that the laws at issue are explicable only by class-based animus. *Lawrence* decided that criminal laws against homosexual sodomy served no legitimate state interest that could justify the state's "intrusion into the personal and private life of the individual." 539 U.S. at 578, 123 S.Ct. 2472. But the *Lawrence* Court expressly recognized that the case did not involve "whether the government must give formal recognition to any relationship that homosexual persons seek to enter." *Id.* Texas's marriage and divorce laws serve legitimate state interests. *See id.* at 585, 123 S.Ct. 2472 (O'Connor, J., concurring) (identifying "preserving the traditional institution of marriage" as a legitimate state interest). In sum, *Romer* and *Lawrence* are distinguishable and offer appellee's position no support. Moreover, other courts have rejected similar arguments that statutes limiting marriage to opposite-sex couples are animus-based. *See, e.g., Citizens for Equal Prot.,* 455 F.3d at 868 (concluding that Nebraska's law limiting marriage to opposite-sex couples was not "inexplicable by anything but animus towards same-sex couples") (internal quotations omitted); *Standhardt,* 77 P.3d at 465 (rejecting contention that Arizona's similar law was "inexplicable by anything but animus") (internal quotations omitted); *Andersen,* 138 P.3d at 980–81 (rejecting contention that Washington's similar law was adopted solely because of anti-homosexual sentiment).

Appellee's bald assertion regarding section 6.204's supposed "guilt by association," without any legal analysis or precedent supporting it, is without merit. We conclude that the Texas laws in question

---

11. Appellee mistakenly refers to section 6.302 as voiding consanguineous marriages; we presume he intended to refer to section 6.201. He also erroneously refers to section 6.205 as voiding "quasi-incestuous" marriages. Section 6.205 addresses marriage to minors younger than 16; we presume he intended to refer to section 6.206, which voids marriage to a stepchild or stepparent.

do not unconstitutionally stigmatize appellee.

## E. Conclusion

The trial court erred by ruling that article I, section 32(a) of the Texas Constitution and section 6.204 of the Texas Family Code violate the Equal Protection Clause of the Fourteenth Amendment. Texas's laws providing that its courts have no subject-matter jurisdiction to adjudicate a petition for divorce by a party to a same-sex marriage do not violate the Equal Protection Clause of the Fourteenth Amendment, a provision never before construed as a charter for restructuring the traditional institution of marriage by judicial legislation.[12]

## VI. Disposition

We conditionally grant the State's petition for writ of mandamus and direct the trial court to vacate its order to the extent it strikes the State's petition in intervention. The writ will issue only if the trial court fails to immediately comply.

We vacate the trial court's second order denying the State's plea to the jurisdiction. We reverse the trial court's first order to the extent it denies the State's plea to the jurisdiction, and we remand the case to the trial court with instructions to dismiss for lack of subject-matter jurisdiction.

## SUPPLEMENTAL OPINION ON MOTION FOR EN BANC RECONSIDERATION

Appellee J.B. has filed a motion for en banc reconsideration. The motion is denied.

 In his motion, Appellee asserts that we erred by ignoring his arguments

on appeal that article I, section 32(a) of the Texas Constitution and section 6.204 of the Texas Family Code violate the Due Process Clause, the First Amendment right to free association, and the constitutional right to travel. In its amended order denying the State's plea to the jurisdiction, the trial court ruled that section 6.204 of the family code violates all of those rights. But, as noted in our original opinion, that order was a legal nullity because it was signed during the automatic stay imposed by section 51.014(b) of the civil practice and remedies code.

Appellee did not present his constitutional challenges based on due process, the right to free association, and the right to travel to the trial court, and the State had no opportunity to respond to them in that court. We will not consider grounds for affirmance that were not presented to the trial court and to which the other side had no opportunity to respond. *Victoria Gardens of Frisco v. Walrath,* 257 S.W.3d 284, 289–90 (Tex.App.-Dallas 2008, pet. denied); *see also Guar. Cnty. Mut. Ins. Co. v. Reyna,* 709 S.W.2d 647, 648 (Tex.1986) (per curiam); *cf. City of San Antonio v. Schautteet,* 706 S.W.2d 103, 104 (Tex.1986) (court of appeals should not have addressed appellant's constitutional challenge that was never presented to the trial court).

Appellee's motion for en banc reconsideration is denied.

---

**12.** *Cf. Baker,* 191 N.W.2d at 186 ("The due process clause of the Fourteenth Amendment is not a charter for restructuring [the historic institution of marriage] by judicial legislation.").